IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

ROBERTO ADAMS,                    §
                                  §
          Plaintiff,              §
                                  §
vs.                               §    Civil Action No. L-08-165
                                  §
CITY OF LAREDO, TEXAS,            §
                                  §
          Defendant.              §

## MEMORANDUM AND ORDER

Roberto Adams has sued the City of Laredo alleging that
Laredo police officers used excessive force when they arrested
him, violating his rights under the Fourth and Fourteenth
Amendments. On August 30, 2010, the City filed a motion for
summary judgment. (Dkt. 24.) Adams responded, the City replied,
and Adams filed a surreply. (Dkt. Nos. 26, 27, 28.) Having
considered the evidence, the applicable law, and the parties'
respective arguments, Defendant's motion for summary judgment is
GRANTED in part and DENIED in part.

## BACKGROUND

The incident giving rise to this lawsuit occurred on
January 15, 2007.[1] That afternoon, Adams stopped by a
veterinarian's office in Laredo, Texas, to check on test results

---

[1] In his affidavit, Adams mistakenly testifies that the incident
occurred on July 15, 2007. (Dkt. 26, Attach. 1, at 2, 4.)

he needed for his job with the Texas Animal Health Commission. (Dkt. 26, Attach. 1, at 2.) He left the office in his state issued pickup truck. (Id. at 3.) As he was driving, Adams began to suffer from acute hypoglycemia, also known as diabetic shock. The hypoglycemia caused Adams to blackout. (Id.) He remembers leaving the vet's office and turning right onto McPherson Avenue, but remembers nothing between that point and when he was later forcibly removed from his vehicle by Laredo police officers. (Dkt. 25, Attach. 3, at 8–10.)

Defendant submitted the written police statement of Jacqueline Gonzalez, who claimed that she was driving south on McPherson when a white pickup truck (Adams) began following very close to her rear bumper. (Dkt. 24, Attach. 1, at 2.) She stated that the truck almost rear-ended her vehicle twice, which prompted her to call the Police Department and report the incident. (Id.) Gonzalez claimed that she had turned off McPherson and circled back around the block when she saw the truck hit a vehicle at the corner of McPherson and San Jose. (Id.) She stated that after the accident, the truck drove off, narrowly missing other vehicles parked on the side of the road. (Id.)

At some point, presumably in response to Gonzalez's call, police dispatch issued a "lookout" for Adams's vehicle. (Dkt. 24, Attach. 21, at 5.) Laredo police officer Mario Bernal was on

patrol in the area when he saw a white truck matching the description run a stop sign at the intersection of San Jose and Springfield. (Id. at 5–6.) Bernal turned on his lights and siren and began pursuit. (Id. at 6.) Adams, however, kept on driving. (Id.) He continued down San Jose for six or seven blocks until he crashed into a metal barrier near the intersection of San Jose and San Francisco. (Id.) Officer Bernal exited his vehicle and approached the driver's side of the truck, yelling for Adams to turn off the vehicle and get out. (Id.)

In the meantime, officers Juan Rodriguez and Jacqueline Siegfried arrived at the scene.[2] (Id.) As officer Rodriguez approached the truck, he noticed its reverse lights switch on. (Dkt. 24, Attach. 20, at 18.) He ran up to the driver's side door and began hitting the window with his hand and yelling for Adams to get out of the truck. (Id.) Rodriguez testified that Adams did not respond, but rather sat in the vehicle looking forward with his hands on the steering wheel. (Id.) At that point, Rodriguez believed that his only option to get Adams out of the truck was to break the driver's side window. (Id.) He hit the window twice with his flashlight, but the window did not break. (Id.)

---

[2] Officer Siegfried arrived at the scene shortly after officer Rodriguez. (Dkt. 24, Attach. 21, at 6.)

Shortly after Rodriguez hit the window, Adams accelerated in reverse. (Id. at 19.) By then, officers Siegfried and Bernal were standing behind the truck and were forced to jump out of the way to avoid being hit. (Dkt. 25, Attach. 1, at 6-7.) Adams put the truck back into drive and proceeded south on San Francisco. (Dkt. 24, Attach. 20, at 19.) The officers ran back to their vehicles and continued the chase. (Id.)

Adams turned left on Montgomery, and right on Barcelona, reaching speeds of sixty to sixty-five miles per hour.[3] (Id. at 20; Dkt. 25, Attach. 1, at 8.) As he was driving south on Barcelona, Adams almost had a head-on collision with Officer Juan Cardenas, who was traveling in the opposite direction. (Dkt. 24, Attach. 20, at 20; Dkt. 25, Attach. 2, at 5.) Adams continued through the intersection of Barcelona and Lyons, jumped a curb and sidewalk, and then went down the embankment that borders Zacate creek. (Dkt. 24, Attach. 20, at 20.)

When the officers reached the scene, the truck was stuck in a muddy area next to the creek. (Dkt. 25, Attach. 1, at 8.) Adams was still attempting to maneuver the vehicle, causing the wheels to spin and the truck to slide back and forth. (Dkt. 25, Attach. 2, at 6.) Eventually, officer Cardenas used his metal baton to break the driver's side window. (Id. at 6.)

---

[3] Officer Siegfried testified that the speed limit in the area is thirty miles per hour. (Dkt. 25, Attach. 1, at 8.)

At this point, Adams apparently recovered from his blackout. He claims to remember the window breaking and the events that followed. (Dkt. 25, Attach. 3, at 10.) However, his version of the facts, and that of the City, differ significantly.

According to the City, after the window was broken, officer Rodriguez opened the driver's side door and attempted to pull Adams out of the truck. (Dkt. 24, at 10–11.) Adams resisted by gripping the steering wheel, but Rodriguez, with the help of officer De La Garza, managed to pull him out. (Dkt. 26 Attach. 9, at 6.) The officers forced Adams to the ground; he landed on his back and moaned as though he may have been hurt. (Dkt. 24, at 11; Dkt. 24, Attach. 20, at 30.) They turned Adams onto his stomach to put handcuffs on, but Adams again resisted, keeping his arms underneath his body with his hands pulled up against his chest. (Dkt. 24, at 11.) Eventually, the officers managed to get Adams's arms free and apply the handcuffs. (Id.) Rodriguez lifted Adams up off the ground and he and Bernal escorted him to Rodriguez's police vehicle. (Id.) They patted him down and put him in the backseat. (Id.)

According to Adams, as soon as he was pulled from the truck he felt a "big blow to [his] head and [he] went down." (Dkt. 26, Attach. 1, at 3.) He fell face up, but the officers turned him over and pulled his arms back to handcuff him. (Id.) He could

not move or communicate, but in no way resisted the officers, who were cursing at him and calling him names. (Id.) The officers began hitting and kicking Adams as he laid on the ground helpless, in a nonadversarial position. (Dkt. 8, at 3.) He felt blows to his head, back, and legs, more than twenty in all. (Dkt. 26, Attach. 1, at 3.) He testified that when the officers stopped beating him, he was dragged through the mud to Rodriguez's police car, patted down, and placed in the backseat.[4] (Id.)

The parties agree that officer Rodriguez drove Adams to the hospital shortly after he was arrested.[5] (Dkt. 24, Attach. 20, at 33; Dkt. 26, Attach. 1, at 3.) When they arrived, Adams was confused; he asked Rodriguez where he was and why he was there. (Dkt. 25, Attach. 3, at 15–16.) Rodriguez told Adams they were at the hospital and asked if he was aware of what had happened. (Id.) When Adams said "no," Rodriguez asked Adams if he was a diabetic. (Id. at 16.) Adams responded that he was, and Rodriguez said nothing else. (Id.) They went into the hospital and Adams was evaluated and treated for hypoglycemia. A doctor

---

[4]  Adams also alleges that the officers believed he was intoxicated when they arrested him. (Dkt. 8, at 2.)

[5]  Rodriguez testified that he took Adams to the hospital because he moaned when he was dragged out of his truck and because he appeared to be in pain when walking to the police car. (Dkt. 24, Attach. 20, at 33–34.)

later informed Adams that his blood sugar levels had been so low that he had almost died, but that his levels were back up again and that "hopefully [he was] going to be okay." (Dkt. 26, Attach. 1, at 3.) Adams was initially charged with evading arrest, but that charge was later dropped. (Dkt. 26, Attach. 8, at 6.)

Adams filed suit on December 22, 2008, originally naming as defendants the City, the Mayor, the City Manager, the Chief of Police, the former Chief of Police, and four of the officers involved in the arrest. (Dkt. 1, at 1–2.) On September 8, 2009, Adams filed an amended complaint dropping all defendants except the City. (Dkt. 8.)

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." Sossamon v. Lone Star State of Tex., 560 F.3d 316, 326 (5th Cir. 2009) (quoting Hamilton v. Segue Software, Inc., 232 F.3d 473, 477 (5th Cir. 2000)). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." Id. (quoting Hamilton, 232 F.3d at 477). In determining whether

a fact issue exists, the Court views "the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 412 (5th Cir. 2003).

The moving party bears the initial burden of showing that there is no genuine fact issue. Condrey v. Sun Trust Bank of Ga., 429 F.3d 556, 562 (5th Cir. 2005) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Where the burden of proof at trial rests on the nonmovant, the movant may satisfy its initial burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325; see also Cuadra v. Hous. Indep. Sch. Dist., 626 F.3d 808, 812 (5th Cir. 2010). "Once the moving party has demonstrated the absence of a material fact issue, the non-moving party must 'go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.'" Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)). This burden is not satisfied with conclusory allegations, unsubstantiated assertions, or by establishing "some metaphysical doubt as to the material facts," Id. (quoting Little, 37 F.3d 1075). Rather, the nonmoving party "is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports

his or her claim." <u>Ragas v. Tenn. Gas Pipeline Co.</u>, 136 F.3d 455, 458 (5th Cir. 1998). If the evidence produced by the nonmovant "is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted).

<u>DISCUSSION</u>

In his amended complaint, Adams brings a Fourth Amendment excessive force claim under 42 U.S.C. §1983, and what appears to be a claim for malicious prosecution. (Dkt. 8, at 4-5.) Both claims are considered below.

A. §1983 Excessive Force Claim

In its motion for summary judgment, the City argues that the force used during Adams's arrest was reasonable, and therefore not excessive, and that the facts are insufficient to establish municipal liability under §1983.[6]

---

[6] Both parties objected to the timeliness of the other's filings. The City argues that Adams's response and evidentiary objections should be stricken as untimely. (Dkt. 27, at 1.) It notes that it filed its motion for summary judgment on August 30, 2010, and that Adams filed his response and objections on September 21, 2010, twenty-two days later. (Dkt. 26.) The City admits, however, that while its motion for summary judgment and thirteen of the exhibits were filed on August 30, the other eleven exhibits were filed shortly after midnight, on August 31. (Dkt. 27, at 2.) The scheduling order provided an August 30, 2010 deadline for contested motions. (Dkt. 18.) On this basis, Adams objects to the timeliness of the exhibits filed on August 31. (Dkt. 24, at 4-5.) These objections are overruled. The delay in both cases was minimal and neither party was prejudiced.

### 1. Excessive Force

Claims that law enforcement personnel used excessive force during the course of an arrest are analyzed under the Fourth Amendment and its "reasonableness" standard. Bazan v. Hidalgo Cnty., 246 F.3d 481, 487 (5th Cir. 2001). To prevail in a §1983 excessive force claim, "a plaintiff must show that he was seized and that he 'suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" Ballard v. Burton, 444 F.3d 391, 402 (5th Cir. 2006) (quoting Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir. 2004)). Whether the force used was excessive or unreasonable depends on "the facts and circumstances of each particular case." Deville v. Marcantel, 567 F.3d 156, 167 (5th Cir. 2009) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham, 490 U.S. at 396).

In its motion for summary judgment, the City argues that Adams was not punched, stomped, kicked, or otherwise struck, and that the force used by the officers was reasonable based on the totality of the circumstances. (Dkt. 24, at 11–20.) It argues

that Adams's version of the facts is not supported by the evidence, but rather is "the product of distorted memory or perception" caused by his hypoglycemic state. (Id. at 14.)

In support, the City included the report of its medical expert, Dr. Al Davies. Davies opined that that "Mr. Adams'[s] hypoglycemia produced his loss of memory which is associated with distorted perceptions which combine to become distorted memories." (Dkt. 25, Attach. 4, at 4.) He also opined that hypoglycemic patients often become agitated and resist efforts to aid them, and that Adams's struggle with the officers and his fall from the truck could explain "the skin findings in the photographs" of Adams's injuries. Id.

The City also points to statements Adams made when he arrived at the hospital indicating that he was confused, and that he did not know where he was.[7] (Dkt. 24, at 13.) The City produced hospital records from the day of the arrest, which state that Adams was involved in a motor vehicle accident and that he was "unable to recall what occurred." (Dkt. 25, Attach. 5, at 11.) The City also argues that Adams's injuries were "minor" and not consistent with the injuries that he would have

---

[7]   The City points to two statements Adams made during his deposition. (Dkt. 24, at 13.) While these statements do indicate that Adams was confused when he arrived at the hospital, they are not inherently inconsistent with his assertion that he recovered his memory when the officers broke his window and pulled him from the truck.

sustained had his version of the facts actually occurred. (Dkt. 24, at 17.) Finally, the City notes inconsistencies in various letters and Adams's deposition testimony as to whether he first went to the eye doctor's office, or the vet's office, on the day of the incident. (Id. at 17–19.)

Adams attached his affidavit to his response to the City's motion. There, Adams testified that when the police officers dragged him from his truck, he was struck in the head and fell down. (Dkt. 26, Attach. 1, at 3.) He stated that the officers beat him while he was on the ground, both as he was handcuffed, and after the handcuffs were on. (Id.) He stated that he felt blows to his legs, back, and head, more than twenty in all. (Id.) He stated that he could not move or communicate, but in no way resisted the officers, who were cursing at him and calling him names. (Id.) He stated that when they finished beating him, they dragged him through the mud to a police vehicle and put him in the back seat. (Id.)

Adams also produced the affidavit of his physician, Dr. Luis Benavides. (Dkt. 26, Attach. 13.) Benavides testified that he examined Adams the day after the arrest and that Adams's injuries were consistent with those of past patients who had been involved in physical assaults.[8] (Id. at 3.) Specifically,

---

[8] In his deposition testimony, Dr. Benavides testified that he examined Adams on January 16, 2007, the day after the arrest.

Benavides testified that Adams had a hematoma on the right side of his head, bruising on the left side of his head, bruising on his lower left neck, a hematoma and bruising on his upper right thigh, and multiple abrasions and bruising on his lower back and right flank. (Id. at 2-3.)

Viewed in the light most favorable to Adams, the evidence shows that there are questions of fact as to the elements of an excessive force claim. As such, summary judgment on this issue would be improper.

### 2. Municipal Liability

Typically, to prove a claim under §1983 a plaintiff must (1) establish "a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under the color of state law." Lauderdale v. Tex. Dep't of Crim. Justice, 512 F.3d 157, 165 (5th Cir. 2007). However, when bringing a §1983 claim against a municipality, the plaintiff must also satisfy the requirements set forth in Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978).

---

(Dkt. 25 Attach. 6, at 4, 12.) In his affidavit, however, Benavides testified that he examined Adams on July 16, 2007. (Dkt. 26, Attach. 13, at 2;) The Court assumes that this is a typographical error. Adams made the same mistake in his affidavit, stating that the arrest occurred on July 15, 2007, rather than January 15, 2007. (Dkt. 26, Attach. 1, at 2.)

In Monell, the Supreme Court held that while a municipality is a "person" subject to suit under §1983, it is not liable on the basis of respondeat superior.[9] Id. at 690-91. Rather, a municipality is only liable under §1983 for acts that are directly attributable to it through some "official action or imprimatur." Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir. 2001). Thus, to establish municipal liability under §1983, a plaintiff must identify: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." Valle v. City of Houston, 613 F.3d 536, 541-42 (5th Cir. 2010) (quoting Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002)).

The culpability and causation requirements for municipal liability under §1983 are rigorously enforced. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 415 (1997) ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior."). Culpability is established by the existence of an official

---

[9] Section 1983 provides in part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

policy. Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009). The policy itself must be unconstitutional, or, if not, it must have been adopted "with deliberate indifference to the known or obvious fact" that the constitutional violation at issue would result. James v. Harris Cnty., 577 F.3d 612, 617 (5th Cir. 2009) (quoting Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force, 379 F.3d 293, 309 (5th Cir. 2004)). "Deliberate indifference is a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" Id. at 617–18 (quoting Rhyne v. Henderson Cnty., 973 F.2d 386, 392 (5th Cir. 1992)). Plaintiffs must also satisfy a heightened causation standard. Valle, 613 F.3d at 546. This standard is satisfied by showing that the municipality's official policy was the "moving force" behind the plaintiff's constitutional violation. In other words, there must be "a direct causal link" between the policy and the constitutional violation. Peterson, 588 F.3d at 848.

An "official policy" can exist in various forms. In its more traditional form, it consists of a "policy statement, ordinance, regulation or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority." Pineda, 291 F.3d at 328 (quoting Webster v. City of

Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc)). A policy is also deemed to exist when there is a "persistent widespread practice of City officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy." Id. (quoting Webster, 735 F.2d at 841). In the latter scenario, actual or constructive knowledge of the custom must be attributable to the municipality's governing body, "or to an official to whom that body has delegated policy-making authority." Id.

A municipality's failure to adequately train its employees can also constitute a policy capable of subjecting a municipality to liability under §1983. City of Canton v. Harris, 489 U.S. 378, 380 (1989); see also World Wide St. Preachers Fellowship v. Town of Columbia, 591 F.3d 747, 756 (5th Cir. 2009). To succeed in a failure-to-train claim, a plaintiff must show: "(1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." Zarnow v. City of Wichita Falls, 614 F.3d 161, 170 (5th Cir. 2010). As noted above, "[d]eliberate indifference is a stringent standard, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."

_Valle_, 613 F.3d at 547 (quoting _Brown v. Bryan Cnty_, 219 F.3d 450, 457 (5th Cir. 2000)). In the context of failure-to-train claims, proving deliberate indifference typically requires showing a pattern of similar violations. _Id._ (citing _Sanders-Burns v. City of Plano_, 594 F.3d 366, 381–82 (5th Cir. 2010)). "The prior acts must be 'fairly similar to what ultimately transpired and, in the case of excessive use of force, the prior act must have involved injury to a third party." _Sanders-Burns_, 594 F.3d at 381 (quoting _Davis v. City of N. Richland Hills_, 406 F.3d 375, 383 (5th Cir. 2005)).

However, while difficult, it is possible to prove deliberate indifference in a failure-to-train claim without showing a pattern of similar violations. _Id._ The Supreme Court discussed this possibility in _Brown_, 520 U.S. 397:

> In leaving open in _Canton_ the possibility that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations, we simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle the situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.

_Id._ at 409.

A municipality's failure to supervise or discipline its employees can also constitute a policy capable of subjecting it to liability under §1983. These claims are analyzed using the same framework applied in failure-to-train claims. Deville v. Marcantel, 567 F.3d 156, 171 (5th Cir. 2009) (citing Piotrowski, 237 F.3d at 581). Thus, a plaintiff must show that (1) the City failed to supervise or discipline its employees; (2) that the failure to supervise or discipline amounted to deliberate indifference; and (3) that there is a direct causal link between the failure to supervise or discipline and the alleged constitutional violation. See Lewis v. Pugh, 289 Fed. Appx. 767, 771–72 (5th Cir. 2008).

The Court construes Adams's amended complaint as alleging the following theories of municipal liability: (1) that the City has a customary policy of "tolerating and inciting" excessive force;[10] (2) that the City has failed to adequately train its officers on the use of force generally; (3) that the City has failed to train its officers on identifying and dealing with suspects suffering from hypoglycemia; and (4) that the City has

---

[10] Adams alleges that the City "has a history of tolerating and inciting the use of excessive and unreasonable force to such an extent that *it* has become custom or habit." (Dkt. 8, at 5 (emphasis added).) It is not entirely clear whether "it" refers to a custom of "tolerating and inciting" excessive force, or a custom of using excessive force. Regardless, Adams has not produced evidence of widespread, pervasive policy of either sort.

failed to adequately supervise the officers involved in Adams's arrest. (Id.) Each of these theories is considered below.

### (a) Custom of Tolerating and Inciting Excessive Force

Arguing that it does not condone or incite the use of excessive force, the City points to the following paragraph in the declaration of the Assistant Police Chief Gilbert Navarro: (Dkt. 24, at 22.)

> While I have been employed by the City of Laredo, the City and its Police Department have not authorized, encouraged, sanctioned or condoned a custom, policy or practice of tolerating and inciting the use of excessive of unreasonable force. To the contrary, any such conduct would violate City policy. Attached to the motion for summary judgment are copies of the Laredo Police Department's policies regarding use of force and arrest in effect in 2007. Copies of these policies were provided to police officers and are well known to them. Police Officers are trained on these policies and are expected to abide by these policies.[11]

(Dkt. 25, Attach. 9, at 4.) The attached policies, which come in the form of various police manuals, include directives on when force may be used, the amount of force that is authorized, and how the use of force should be reported. (Dkt. 25, Attach. 10, at 6, 45.) The General Order Manual specifically provides that "the policy of the Laredo Police Department shall be that

---

[11] Adams objected to this evidence on the grounds that it is "self-serving, conclusory, no basis for the conclusion stated therein is provided" and that it "goes, in part, to the ultimate issue." (Dkt. 26, at 5.) This objection is overruled.

officers shall use the least amount of force necessary to subdue and/or arrest any person." (Id. at 45.)

In support of this theory, Adams produced evidence that the officers involved in his arrest have engaged in excessive force before. The City's responses to Adams's interrogatories show that four of the six officers involved in the arrest have past excessive force complaints, with two having multiple prior complaints.[12] (Dkt. 26, Attach. 10, at 3.) However, as mentioned above, to establish a "custom" for the purposes of §1983, one must produce evidence of a "persistent and widespread practice" of city employees. See Pineda, 291 F.3d at 328. This evidence is too narrow in scope to make that showing. The Court cannot extrapolate a department-wide policy from four officers' prior excessive force complaints.

Adams also presented evidence that his friend Arturo Vela, a Laredo police officer, told him that leaders in the police department instruct officers not to beat suspects, but that some of younger officers do it anyway. (Dkt. 26, Attach. 1, at 4.) Assuming, arguendo, that this is admissible evidence, the fact

---

[12] The City indicated that the officers had the following number of prior excessive force complaints: Juan Rodriguez (3); Abraham De La Garza (1); Mario Bernal (0); Jacqueline Siegfried (0); Juan Cardenas (1); David Hernandez (2). (Dkt. 26, Attach. 10, at 3.) Officer Hernandez's involvement in the case/arrest is unclear. The interrogatory answer showed that officer De La Garza has two excessive force complaints, but one of those was filed after Adams's arrest. (Id.)

that department leaders instruct officers not to beat suspects itself suggests that there is no "common and well-settled" policy of tolerating and inciting excessive force. See Pineda, 291 F.3d at 328. Rather, Vela's statement simply suggests that contrary to department policy, officers sometimes use excessive force. Holding the City liable for this type of behavior would be respondeat superior in the purest sense, which, again, is strictly prohibited by Monell.

Adams also alleges that the City "ignores complaints and evidence of police misconduct in the use of excessive force unless the victim reduces the allegations to writing." (Dkt. 26, at 19.) In support of this assertion, Adams points solely to the declaration of Assistant Chief of Police Gilbert Navarro. (See id. at 6, 21.) Navarro testified that the department does investigate complaints against officers, and that "[i]n cases like this, it is the practice of the police department to obtain a written complaint before an investigation is initiated." (Dkt. 25, Attach. 9, at 7.) He further stated that "[h]ad Mr. Adams verbally complained about excessive use of force or his arrest, he would have been asked to make his complaint in writing." (Id.) Asking that a complaint be put in writing is not tantamount to ignoring complaints.

Finally, Adams produced evidence that three of the police officers involved in his arrest could not recall details about

their past excessive force complaints. (Dkt. 26, at 21.) Specifically, officer Abram De La Garza acknowledged that he had been accused of excessive force, but stated that he could not remember the number of times. (Id.) Officer Juan Rodriguez testified that he did not remember the factual bases for his three prior excessive force complaints. (Id.) Officer Juan Cardenas testified that he could not remember why he was accused of excessive force or the outcome of the complaint. (Id.) This evidence does not illuminate the issue of whether the City tolerated and incited excessive force, and in any event, it would again be too narrow in scope from which to extrapolate a department-wide policy.

Adams's evidence does not raise a fact issue as to whether the Laredo Police Department has a "widespread," "well-settled" policy of tolerating and inciting excessive force. As such, this claim will be dismissed.

### (b) Failure to Train in the Use of Force

In its motion for summary judgment, the City argues that the Laredo police department has established policies on the use of force, arrests, searches and seizures, and that officers are trained on these policies and expected to abide by them. (Dkt. 24, at 22.) In support, the City points to the declaration of Assistant Police Chief Navarro, who states the same. (Dkt. 25,

Attach. 9, at 3-4 .) The City also attached, and cites generally
to, various manuals that contain the City's policies in effect
at the time of Adams's arrest. (Dkt. 25, Attach. 10.)

Navarro also testified that all Laredo police officers have
met "the minimum training requirements of the Texas Commission
on Law Enforcement Officers Standards and Education (TCLEOSE)"
and that all officers "have received the state-mandated training
program in the use of force and arrests at one time or another."
(Dkt. 25, Attach. 9, at 5.) He testified that all officers
receive training on arrests and the use of force at the Laredo
Police Academy, and that they receive additional training on
those subjects during their 12 month probationary period after
graduating from the academy. (Id.) The City attached the
training records of the five officers who, at this point, were
known to be involved in the arrest.[13] (Dkt. 25, Attach. 11.) The
records indicate that the officers have all taken classes on the
use of force.[14] (Id.)

---

[13] The City did not include the training records for officer
David Hernandez. (See Dkt. 25, Attach. 11.)

[14] Adams objects to the officers' training records as
unauthenticated, unsworn, and hearsay. These objections are
overruled. Assistant Police Chief Navarro authenticates the
records in his declaration. (Dkt. 25, Attach. 9, at ¶ 11.) The
training records are maintained by the TCLEOSE, a state agency,
pursuant to Title 37, Rule 217.13 of the Texas Administration
Code, and therefore fall within the public records hearsay
exception set forth in Fed. R. Evid. 803(8). Finally, the
language requiring that a party attach a "certified or sworn

The Fifth Circuit has instructed that "for liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective." Roberts v. City of Shreveport, 397 F.3d 287, 293 (5th Cir. 2005). Adams has identified no particular shortfall with the City's training policy on the use of force, and has not produced any evidence that meaningfully supports the claim. Additionally, the Fifth Circuit has instructed that compliance with state training requirements is "a factor counseling against a 'failure to train' finding." Zarnow, 614 F.3d at 171.(citing Conner v. Travis Cnty., 209 F.3d 794, 798 (5th Cir. 2000)); see also Sanders-Burns, 594 F.3d at 381-82 ("[W]hen officers have received training required by Texas law, the plaintiff must show that the legal minimum of training was inadequate."). The City produced evidence that the officers have satisfied the state training requirements under Texas law.

Adams has failed to raise a fact issue as to whether the City failed to adequately train its officers on the use of force. This claim will also be dismissed.

(c) Failure to Train in Recognizing Hypoglycemic Suspects

---

copy" of a paper referred to in an affidavit was eliminated in the 2010 amendments to the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 56, Advisory Committee Comments, 2010 Amendments, Subdivision (c)(4).

In its motion for summary judgment, the City acknowledges that it does not provide training on recognizing suspects suffering from hypoglycemia. Its primary argument is that Adams "cannot show that there was a constitutional duty to train and that the failure to train caused a constitutional violation." (Dkt. 24, at 23.) Thus, the City is targeting the deliberate indifference and causation elements of this claim.

With respect to deliberate indifference, the City argues that Adams "cannot show similar incidents that would have placed the City on notice that the suggested training was needed to prevent constitutional violations." (Id.) In support, the City points to the declaration of Assistant Police Chief Navarro:

> During my employment with the Laredo Police Department, I cannot recall a single incident where a person who was suffering from hypoglycemia was injured by police officers who failed to recognize the condition. There has never been a need to implement such training. Because police officers often face unforeseen and random circumstances, the Police Department gives them authority to exercise discretion when confronting circumstances that are not covered by specific policies, such as the incident involving Mr. Adams.

(Dkt. 25, Attach. 9, at 5.)

As discussed above, to prove deliberate indifference in the context of a failure-to-train claim, a plaintiff must typically show a pattern of similar incidents. Adams has not alleged or produced any evidence of a pattern, or even another instance, of Laredo police officers using excessive force on a suspect suffering from hypoglycemia.

Furthermore, this case does not fall within the "narrow range of circumstances" where a single incident will suffice for a showing of deliberate indifference. Adams has provided no evidence that the use of excessive force is an "obvious," "highly predictable" consequence of not training police officers to recognize suspects suffering from hypoglycemia.

Adams has also failed to allege or demonstrate any causal link between the officers' lack of hypoglycemia training and the alleged use of excessive force during his arrest. According to Adams, when his vehicle finally stopped, the officers pulled him from his truck and immediately struck him on the head and then began to beat him while he lay on the ground helpless in a nonadversarial position. (Dkt. 8, at 3.) If true, it would certainly appear that the officers used excessive force. Adams's theory seems to be that these officers had a general propensity to use excessive force. If so, it would seem highly unlikely that prior training on hypoglycemia would deter them from using excessive force on this occasion. Even if one could postulate a remote connection between the absence of hypoglycemia training and use of excessive force by these officers on this occasion, that connection is too tenuous to satisfy the heightened standard required to hold a municipality liable under §1983. See Valle, 613 F.3d at 546 (noting the heightened causation standard). This claim will be dismissed.

### (d) Failure to Supervise

As discussed at the hearing on April 18, 2011, the viability of Adams's failure to supervise claim depends largely on the details of the arresting officers' prior excessive force complaints. The City indicated that the officers Adams identified "as involved in the lawsuit" have the following number of prior complaints: Juan Rodriguez (3); Abraham De La Garza (1); Mario Bernal (0); Jacqueline Siegfried (0); Juan Cardenas (1); David Hernandez (2).[15] (Dkt. 26, Attach. 10, at 3.) At this point, there is no information in the record as to the factual bases for these complaints, or whether they were investigated by the City. The only evidence is that the complaints were filed and that none of the officers were "disciplined, placed on probationary status or suspended" as a result.[16] (Id. at 3-4.) As of now, this claim survives.

B. Malicious Prosecution

---

[15] Officer Hernandez's involvement in the case/arrest is unclear. The City's interrogatory answer showed that officer De La Garza has two excessive force complaints, but one of those was filed after Adams's arrest. (Dkt. 26, Attach. 10, at 3.)

[16] As discussed earlier, the officers were unable to recall details about their prior complaints when asked during their depositions.

It unclear whether Adams actually intends to bring a claim for malicious prosecution. In the "facts" section of his original complaint, Adams alleged that:

> Defendants wrongfully instituted assault [sic] and charged Plaintiff with the crimes of evading arrest and resisting arrest in an attempt to cover up their own wrongdoing. The Defendant City of Laredo is liable for the assault and malicious prosecution, because the Defendant City has tolerated and permitted a pattern of illegal assaults on persons coming into contact with its police officers and has failed to maintain a proper system for reviewing these attacks by its police officers, with the result that police officers of the Defendant City are encouraged to believe that they can violate the rights of persons, such as Plaintiff, with impunity.

(Dkt. 1, at 5.)

There was no mention, however, of malicious prosecution in the complaint's "causes of action" section, where Adams set forth his §1983 excessive force claim and various theories of municipal liability. The Court addressed this issue in an order responding to a motion to dismiss filed by the City. The Court stated that "Plaintiff's Complaint lists no state claims for assault or malicious prosecution. While his facts might intimate such claims, their absence from Plaintiff's 'Causes of Action,' coupled with Plaintiff's failure to respond to [the City's argument in its motion to dismiss], leads to the conclusion that Plaintiff is not pursuing such claims." (Dkt. 7, at 6.) The Court ordered Adams to file an amended complaint, and stated that if Adams "is actually intending to pursue state-law claims

against any defendant, he must specifically identify the factual basis for the claim and which defendant is being charged with the violation." (<u>Id</u>. at 7.)

Adams filed an amended complaint, which once again included a malicious prosecution "claim" in the facts section, but not the causes of action section. The claim's language changed slightly:

> The City of Laredo wrongfully instituted assault [sic] and charged Plaintiff with the crimes of evading arrest and resisting arrest in an attempt to cover up their own wrongdoing. The Defendant City of Laredo is liable for the assault and malicious prosecution, because of the absence of probable cause for the criminal proceedings against Plaintiff. Shortly after filing criminal charges against Plaintiff, the charges were dismissed.

(Dkt. 8, at 4.)

If Adams truly intends to bring a claim for malicious prosecution, he has twice omitted that claim from the causes-of-action section in his complaint, even after the Court cautioned that the claim's absence from that section suggested that it was not being pursued.

In any event, any claim for malicious prosecution must fail. As the City notes in its motion for summary judgment, there is no federal cause of action for malicious prosecution. <u>See Castellano v. Fragozo</u>, 352 F.3d 939, 942 (5th Cir. 2003) ("We decide that 'malicious prosecution' standing alone is no violation of the United States Constitution, and that to proceed

under 42 U.S.C. § 1983 such a claim must rest upon a denial of
rights secured under federal and not state law."); <u>see also</u>
<u>Cuadra v. Hous. Indep. Sch. Dist.</u>, 626 F.3d 808, 812–13 (5th
Cir. 2010); <u>Haggerty v. Tex. S. Univ.</u>, 391 F.3d 653, 658 (5th
Cir. 2004). Likewise, a state law malicious prosecution claim
against the City would be barred by the City's sovereign
immunity. <u>See</u> Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2) (West
2011) (providing that the Texas Torts Claim Act does not waive
immunity for claims "arising out of assault, battery, false
imprisonment, *or any other intentional tort*" (emphasis added));
<u>Closs v. Goose Creek Consol. Indep. Sch. Dist.</u>, 874 S.W.2d 859,
869 (Tex. App.—Texarkana 1994, no writ) ("Malicious Prosecution
is an intentional tort."); <u>see also Davis v. Blankenship</u>, No.
10-10-00213-CV, 2010 Tex. App. LEXIS 10326, at *9 (Tex. App.—
Waco Dec. 29, 2010, no pet.) (mem. op.) ("Malicious prosecution
is also an intentional tort for which immunity is not waived
under [the Texas Tort Claims Act]."); <u>McFadden v. Oleskey</u>, No.
03-09-00187-CV, 2010 Tex. App. LEXIS 6806, at *20 (Tex. App.—
Austin Aug. 19, 2010) ("Appellees acknowledge that a malicious
prosecution claim is an intentional tort and, therefore, the
City of Austin has sovereign immunity against such a claim."),
<u>overruled on other grounds by Franka v. Velasquez</u>, 332 S.W.3d
367 (Tex. 2011); <u>Harrison v. TDCJ-TDCJID</u>, No. 07-03-0239-CV,
2005 Tex. App. LEXIS 4533, at *7 (Tex. App.—Amarillo June 14,

2005, no pet.) (mem. op.) ("Nor does the [Texas] Tort Claims Act waive a governmental unit's immunity from suits . . . alleging malicious prosecution by its agents acting in their official capacity.").

Assuming Adams did intend to bring a malicious prosecution claim against the City, that claim will be dismissed.

<u>CONCLUSION</u>

To summarize, Adams has raised a fact issue as to whether excessive force was used during his arrest, but has failed to do so as to the following theories of municipal liability: (1) that the City had custom of tolerating and inciting the use of excessive force; (2) that the City failed to train its officers on the use of force generally; and (3) that the City failed to train its officers on identifying and dealing with suspects suffering from hypoglycemia. Accordingly, those claims are DISMISSED. Any claim for malicious prosecution is also DISMISSED. Adams's failure to supervise claim survives. Per the April 18, 2011 hearing, the City has filed a supplemental motion for summary judgment on that issue and Adams has filed a response. (Dkt. Nos. 31, 31.)

DONE at Laredo, Texas, this 19th day of May, 2011.

_____
George P. Kazen

Senior United States District Judge